UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cr-00266-TWP-MJD-01 |
| ) | |
| ALLEN WILLIAMS, ) | |
| ) | |
| Defendant. ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant Allen Williams' ("Williams") Motion to Suppress (Filing No. 120). Williams is charged by Superseding Indictment with Count I: Felon in Possession of a Firearm in violation of 18 U.S.C. §922(g)(1); Count II: Felon in Possession of Ammunition in violation of 18 U.S.C. §922(g)(1); and Count III: Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(D). (Filing No. 84.) He seeks to suppress as evidence in this case any and all oral and written communications, confessions, or admissions, alleged to have been made by him and all evidence seized as a result of the information obtained from his statement. (Filing No. 120 at 1.) Williams contends any statements were involuntary statements made due to his physical, psychological, mental, and emotional state and coercive police tactics. *Id*. Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now submits findings of fact and conclusions of law and determines that the Motion to Suppress should be **denied**.

## I. FINDINGS OF FACT

As a preliminary matter, the Court notes that neither party requested a hearing. There are no material disputes concerning the facts and the Motion raises purely legal questions; therefore no evidentiary hearing is required. "District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will

affect the outcome of the motion." *United States v. Curlin,* 638 F.3d 562, 564 (7th Cir. 2011). The relevant facts are corroborated by a transcript and videotape of Williams' interrogation. In addition, Williams raises no objections to the background facts set forth in the Complaint and Affidavit of Special Agent Launa K. Hunt, Bureau of Alcohol, Tobacco, Firearms and Explosives. ([Filing No. 2](Filing No. 2)).

On June 14, 2019, Williams pulled up in his vehicle next to an Indianapolis Metropolitan Police Department ("IMPD") vehicle near the North District Roll Call location. ([Filing No. 2](Filing No. 2).) Williams asked Officer D. Harden ("Officer Harden") if he could ask him a question. Williams then handed Officer Harden a black handgun and said "I am a convicted felon out of Illinois. I am not allowed to have this." *Id.* at 3. Williams told Officer Harden that he wanted to be taken into protective custody because "the Muslims" were trying to kill him. *Id.* Officer Harden asked Williams to follow him to the IMPD North District, and Williams complied. *Id.*

Upon arrival, Williams stated that he wanted the police go kill the Muslims, and that if they would not do it, then he would buy several firearms and kill them himself. *Id.* Williams was placed in handcuffs and seated on a chair outside the front door of North District Roll Call. *Id.* While seated, Williams continued speaking, unprompted. He stated that he had purchased the firearm from a friend for protection, that he is a convicted felon, that he knew he was not allowed to have a firearm, that he sells marijuana and that he had money in his car that he had made from selling marijuana. *Id.* at 3-4.

Based on Williams' unusual behavior, the IMPD Mobile Crisis Assistance Team ("MCAT") responded to a call to assist. ([Filing No. 125 at 3](Filing No. 125 at 3)). Williams spoke with the Behavioral Health Specialist officer and explained that he had been going to the Nation of Islam mosque, but decided not to become a Muslim, and the Muslims had threatened to kill him. *Id.* The MCAT

determined Williams met the criteria for immediate detention, meaning that he would eventually be transported to the hospital for a mental health evaluation. *Id.*

Following this determination, Officers placed Williams in an interview room so that Williams could be interviewed. Williams was in leg restraints but was not handcuffed. The events thereafter are recorded on audio and video, (*See* Filing No. 127) and partial transcripts (Filing No. 125-1, Filing No. 125-2). Williams stated that he was cold, and officers provided him a blanket and jacket. Sargent Hemphill ("Sgt. Hemphill") informed Williams that he was going to read him his *Miranda* rights, as they had discussed when they were upstairs. Williams stated "I just want to sign. I understand my rights as an American and I want to sign" the waiver. (Filing No. 125-1 at 7). Sgt. Hemphill read Williams his *Miranda* rights and Williams signed the waiver form. *Id.* at 8-9. Prior to starting the interview, Williams volunteered several times that he wanted to "confess his sins." *Id*. at 7-8. Thereafter, Williams proceeded to give a detailed statement about his background and his criminal activities. *Id*. at 9-13. He accurately and logically gave his name, age, a list of residences since he arrived in Indianapolis five years ago. He discussed that he and others travel to California with large amounts of cash, purchase marijuana from dispensaries, and travel back with it packaged in their suitcases. Williams stated that he sells the marijuana out of his house. He further stated that he keeps the marijuana in a safe at another woman's house. Williams explained that the gun he turned in to law enforcement was his, and he had purchased the gun after he stopped going to a nearby mosque. He said he had no other guns in his house, but that he did have ammunition. Williams also spoke at length about his experiences at the mosque and teachings of the Nation of Islam. ( Video and (Filing No. 125-2.))

At times during the interview, Williams was animated and was told to calm down by the officers. However, the majority of time during the interview Williams remained calm, mostly sharing information on his own volition, rather than in response to questions from officers. The

interview lasted approximately thirty minutes. (Filing No. 125 at 5). After the interview concluded, Williams was transported to Eskenazi Hospital for a mental health evaluation. *Id*. Once he was at Eskenazi Hospital, Williams was treated with anti-psychotic medications. (Filing No. 120 at 2.)

Using the information Williams shared prior to and during the interview, officers obtained search warrants for Williams' vehicle and home. Consistent with Williams' interview, officers recovered almost $8,000.00 in cash from a suitcase in the trunk of his vehicle. They also recovered a spent .45 caliber shell casing from between the driver's seat and the center console. While searching Williams' home, officers recovered digital scales containing marijuana residue, 46 cannabis oil vape cartridges, multiple bags containing marijuana, a metal cylinder press containing cocaine residue, a vacuum sealer, a handgun holster, and a box of .40 caliber ammunition. *Id*. at 5-6.

On January 28, 2020, Williams counsel filed a motion for Psychological Examination Pursuant to 18 U.S.C. § 4241(B). (Filing No. 34). This Court ordered an evaluation to determine Williams competency to stand trial. (Filing No. 37). Forensic Psychologist David Szyhowski provided a diagnosis of "Rule Out Antisocial Personality Disorder" and "Rule Out Cannabis Abuse Disorder." (Filing No. 49-1 at 8.) Dr. Szyhowski also opined that the "odd manifestations" exhibited by Mr. Williams at the time of his arrest were not related to a chronic psychotic condition such as Schizophrenia." *Id*. Following a hearing on July 2, 2020, the Court found Williams competent to proceed (Filing No. 77), and a trial date is presently scheduled for January 19, 2021.

## II. CONCLUSIONS OF LAW AND DISCUSSION

Williams argues that all confessions, statements, admissions, and consents executed at the time of his arrest were elicited in violation of his constitutional rights under the Fifth, Sixth and

4

Fourteenth Amendments to the United States Constitution, as his waiver was made involuntarily[1]. He asks the Court to suppress all evidence recovered by the Government, directly or indirectly, because of involuntary statements and due to his physical, psychological, mental, and emotional state and coercive police tactics by the officers. (Filing No. 120).

The Fifth Amendment to the Constitution of the United States protects individuals from being compelled to testify against themselves. The Government's burden under *Miranda v. Arizona*, 384 U.S. 436 (1966), is to prove that Williams voluntarily made a knowing and intelligent waiver of his rights. The rule of *Miranda* requires exclusion from evidence, any statements made by a suspect during a custodial interrogation unless the suspect was informed of, and waived, specified constitutional rights. *See*, e.g., *United States v. Podhorn*, 549 F.3d 552 (7th Cir. 2008). The test for a voluntary confession is whether the defendant's will was overborne at the time he confessed. *United States v. Haddon*, 927 F.2d 942, 945–46 (7th Cir. 1991).

In determining whether a statement is voluntary, knowing and intelligent, the court looks at the totality of the circumstances based on the undisputed facts presented. The totality of the circumstances test looks to the entire interrogation, not one specific act by the police or the condition of the suspect. *Light v. State*, 547 N.E.2d 1073, 1079 (Ind. 1989). There are multiple factors that a court can consider when determining the voluntariness of a statement post-*Miranda*, *Miranda* relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *Id.* (citing *Anderson v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990)). To determine whether a confession is voluntary, mental health is only one factor. *Colorado v. Connelly*, 479 U.S. 1576, 163-64 (1986). There must be some official coercion involved such as the police exploiting the mental illness. See *Blackburn v. Alabama*, 361 U.S. 199 (1960).

---

[1] Although Williams' asserts a violation of his Sixth and Fourteenth Amendment rights, he presents no arguments regarding these violations. The Court finds that he has waived these assertions.

Williams argues the Government cannot prove its burden, and therefore, the waiver of his rights violated the Fifth Amendment. Williams argues that to determine the validity of a *Miranda* waiver, two things must be considered; first, the waiver must be voluntary in that it was a product of a free and deliberate choice rather than through intimidation, coercion or deception. (Filing No. 120-1 at 2). Secondly, the waiver must be made with a full awareness of the nature and right being waived and the consequences of doing so. *Moran v. Burbine*, 475 U.S. 412, 427 (1986). *Id*. Williams points out that instead of placing him in protective custody, the police proceeded to question him whereby he made admissions which are in part the foundation of his indictment as well as search warrants for his home and car. *Id*. at 3. He argues that while he waived his *Miranda* rights, the waiver was involuntary because his physical, emotional and psychological state made him unable to understand the full meaning of the waiver, as well as coercive police tactics used by the officers during his interrogation. *Id*. Williams relies on *Blackburn v. Alabama*, 361 U.S. 199 (1960). (Filing No. 120-1 at 2.)

In *Blackburn*, the defendant argued the waiver of his *Miranda* rights was involuntary due to being mentally incompetent and coerced by the police. Medical professionals explained Blackburn was insane on the date of the crime but also believed he was likely insane and incompetent on the day he confessed, as well. *Id*. at 203. The court also determined that aside from the insanity and incompetency, the conditions upon which Blackburn testified made the denial of his due process even more "egregious". These conditions included: the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel, and the composition of the confession by the deputy sheriff rather than by Blackburn. *Id*. at 207-208. The court ultimately held that the "evidence here clearly establishes that the confession most probably was not the product of any meaningful act of volition." *Id.* at 211.

Williams asserts that, like *Blackburn*, the police took advantage of his mental state. He argues the police knew that he was afraid for his life, mentally ill and coming to them for protection; thus, they used his fear and illness to coerce an incriminating statement from him. (Filing No. 120-1 at 3.) Looking at the totality of the circumstances, the record does not support Williams' position and the Government asserts persuasively that Williams' confession was voluntary. (Filing No. 125 at 8.)

The Court has reviewed the video of the interview and there are facts that clearly differentiate this case from *Blackburn*. Unlike in *Blackburn*, where the defendant was interrogated for eight to nine hours and forced to testify in close quarters while being surrounded by police officials, Williams' interview lasted approximately thirty minutes, with two officers present and the officers provided Williams with warm clothing when he told them he was cold. Instead of being coerced or forced to speak with officers, Williams initiated contact with law enforcement officers and willingly explained that he wanted to "confess [his] sins" on multiple occasions unsolicited. When Officer Hemphill began the advisement of Miranda, Williams eagerly asserted that he wanted to sign the waiver, that he understood his rights as an American and he wanted to confess. At times, Williams would make statements that were unusual, however the majority of his statements were logical and rational and proved to be accurate. These circumstances are radically different than the circumstances in *Blackburn*.

Williams also refers to *Keeling v. Kentucky*, 381 S.W. 3d 248, 268 (Ky 2006), in arguing that the police tactics were coercive. In *Keeling*, the defendant argued that the trial court erred in failing to suppress his post-arrest statements to the police, and that because he suffered from a mental illness causing hallucinations and delusions, any statement he made would be unreliable. Keeling also alleged that coercive police tactics played a role in his testimony, and that those tactics included being "left alone in a small holding cell for several hours with an officer guarding the

7

door, given no medication, had no visitors, and forced to sit for a portion of that time in clothes covered in his father's blood." *Id.* at 269. Even still, the court in *Keeling* determined that the police did not engage in coercive activity. When comparing *Keeling* to Williams, the facts are distinct. There is no evidence whatsoever of coercive tactics being employed in order to coax Williams to confess. Instead, Williams was eager to talk and although he volunteered incriminating information, he rationally explained that he wished to confess his sins. In addition, as noted earlier, the majority of Williams statements were reliable.

Although Williams exhibited some disorganized speech and thought patterns; it does not follow that officers "knew or reasonably should have known that the defendant was mentally ill to the point that he was unable to make a free and rational choice about waiving his rights." See generally *Rice v. Cooper* 148 F.3d 747 (7th Cir. 1998). In *Cooper*, the Seventh Circuit explained "the Constitution doesn't protect the suspect against himself…if he understands the Miranda warnings yet is moved by a crazy impulse to blurt out a confession, the confession is admissible because it is not a product of coercion." *Id*. at 750. Based on the totality of the circumstances, the Court finds no coercion on the part of the officers, and Williams' statements were the product of freewill. The Government has met their burden of proving that Williams voluntarily made a knowing and intelligent waiver of his rights. Accordingly, there is no Fifth, Sixth or Fourteenth Amendment violation.

### III. CONCLUSION

While Williams asserts to have made involuntary statements due to his physical, psychological, mental, and emotional state, the Court did not find the facts satisfied all requirements of an "involuntary action". For the reasons explained above, the Motion to Suppress, ([Filing No. 120](#)), is **DENIED**.

**SO ORDERED.**

Date:  11/6/2020

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Eric K. Koselke
Attorney At Law
Ekoselke711@gmail.com

Kelsey Massa
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kelsey.massa@usdoj.gov

Lawrence Darnell Hilton
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lawrence.hilton@usdoj.gov